FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 15, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

NORTHERN NEW MEXICO
STOCKMAN'S ASSOCIATION; OTERO
COUNTY CATTLEMAN'S
ASSOCIATION,

      Plaintiffs - Appellants,

v.

UNITED STATES FISH AND WILDLIFE
SERVICE; GREG SHEEHAN, Principal
Deputy Director & Acting Director of the
United States Fish & Wildlife Service, in
his official capacity,

      Defendants - Appellees.

------------------------------------------------------

CENTER FOR BIOLOGICAL
DIVERSITY; WILDEARTH
GUARDIANS,

      Intervenors - Appellees.

No. 21-2019

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:18-CV-01138-JB-JFR)**

_____

Jeffrey W. McCoy, Pacific Legal Foundation, Sacramento, California (Damien M. Schiff
and Anthony L. Francois, Pacific Legal Foundation, Sacramento, California; A. Blair
Dunn, Western Agriculture, Resource and Business Advocates, LLP, Albuquerque, New
Mexico, with him on the briefs), for Plaintiffs-Appellants.

Ryan Adair Shannon, Center for Biological Diversity, Portland, Oregon (Samantha Ruscavage-Barz, WildEarth Guardians, Santa Fe, New Mexico, with him on the brief), for Intervenors-Appellees.

Rachel Heron, Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C. (Todd Kim, Assistant Attorney General, Andrew C. Mergen, Kevin McArdle, and Devon Lea Flanagan, Attorneys, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Justin Tade, Of Counsel, Senior Attorney, Office of the Solicitor, United States Department of the Interior, Washington, D.C., with her on the brief), for Defendants-Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

This appeal arises from the U.S. Fish and Wildlife Service's designation of critical habitat for the endangered New Mexico Meadow Jumping Mouse. In 2016, the Service exercised its authority under the Endangered Species Act (ESA) to designate nearly 14,000 acres of riparian land in New Mexico, Colorado, and Arizona as critical habitat for the Jumping Mouse.

Two New Mexico ranching associations whose members graze cattle on the designated land challenged the Service's critical habitat determination. The associations contend (1) the Service's methodology for analyzing economic impacts of critical habitat designation violated the ESA and Tenth Circuit precedent; (2) the Service failed to consider the impact of designation on ranchers' water rights on federal lands; and (3) the Service provided inadequate reasoning for its decision to not exclude certain areas from the habitat

2

designation.  The district court rejected each argument and upheld the Service's

critical habitat designation.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.  We conclude

(1) the Service's method for assessing the economic impacts of critical habitat

designation complied with the ESA; (2) the Service adequately considered the

effects of designation on the ranching association members' water rights; and

(3) the Service reasonably supported its decision not to exclude certain areas

from the critical habitat designation.

## I.  Background

The purpose of the ESA is to conserve threatened and endangered species

and their ecosystems.  16 U.S.C. § 1531(b).  To accomplish that goal, the ESA

"directs the Secretaries of Commerce and the Interior to list threatened and

endangered species and to designate their critical habitats."[1]  *Nat'l Ass'n of Home*

*Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007); 16 U.S.C. § 1533.

### A.  The Jumping Mouse

The New Mexico Meadow Jumping Mouse is a tiny brown mammal with a

long tail that accounts for over half its length.  As its name suggests, the mouse is

a highly skilled jumper—wildlife biologists have observed adult mice jumping as

---

[1]  The Secretary of the Interior has jurisdiction over most land species, including the Jumping Mouse, while the Secretary of Commerce generally has jurisdiction over marine species.  *See* 51 Fed. Reg. 19926, 19926 (1986).  The Secretary of the Interior has delegated authority to administer the ESA to the U.S. Fish and Wildlife Service.  *Id.*; *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.

high as three feet, which is over ten times the length of the Jumping Mouse's

body.  The majority of New Mexico Meadow Jumping Mice can be found in New

Mexico, but nearby Arizona and Colorado also contain several populations.



*New Mexico Meadow Jumping Mouse*

The Jumping Mouse's struggle to persist can be traced to its unique

hibernation cycle and "exceptionally specialized habitat requirements."

Intervenors' Supp. App. (Int.-App.) at 110.  Unlike most other mammals, the

Jumping Mouse is only active in the summer months—it spends the rest of the

year in hibernation.  Because of this atypical hibernation cycle, the Jumping

Mouse's survival hinges on its ability to quickly gather enough nutrients and nest

materials from its surrounding habitat, which is generally comprised of dense

vegetation alongside perennial flowing water.  Jumping Mouse populations are

highly vulnerable in part due to habitat loss and degradation, which can be caused

by a variety of factors, including drought, wildfires, flooding, and animals such

as cattle and beavers that modify the surrounding habitat.  The Jumping Mouse's relatively short lifespan and low fecundity also affect its ability to thrive.  The mice typically live up to three years and give birth to one small litter of young each year.

In 2013, the Service proposed listing the Jumping Mouse as an endangered species.  78 Fed. Reg. 37363 (2013).  In its proposed rule, the Service noted that since 2005, researchers have only documented 29 geographically distinct populations of the Jumping Mouse, though the Service suspected that 11 of those populations may already have been extirpated.  *Id.* at 37365.  The Service also expressed concern that seven populations in Arizona may have been compromised due to flooding after several recent wildfires.  *Id.*  Based on these precarious circumstances, the Service surmised that the Jumping Mouse faced an immediate and substantial risk of extinction.  *Id.* at 37367.

On the same day it published its proposed rule for listing the Jumping Mouse as endangered, the Service issued a proposed rule designating the Jumping Mouse's critical habitat.  78 Fed. Reg. 37328 (2013).  Because the Service must consider economic impacts when designating critical habitat, the Service solicited comments concerning "[a]ny foreseeable economic . . . impacts that may result from designating any area."  *Id.* at 37329.  The Service later provided a draft economic analysis to the public and requested additional comments on the analysis.  In total, the Service received 63 comment letters addressing the proposed critical habitat designation during the public comment period.

In March 2016, the Service published a final rule designating about 14,000 acres in New Mexico, Arizona, and Colorado as critical habitat for the Jumping Mouse.[2]  81 Fed. Reg. 14264 (2016).  The designated habitat consists of riparian areas with thick vegetation and flowing water that are either currently occupied by the Jumping Mouse or unoccupied but essential to the conservation of the species.[3]  The Service divided the critical habitat into eight units, three of which include subunits.  Many of the units contain a mix of land owned by the federal government, state government, or private citizens.



General Locations of Critical Habitat for the New Mexico Meadow Jumping Mouse - Overview

---

[2]  The Service issued a final rule listing the Jumping Mouse as endangered in 2014.  79 Fed. Reg. 33119 (2014).

[3]  The Service determined that it was necessary to designate partially occupied and unoccupied areas as critical habitat because the "areas occupied by the mouse since 2005 do not contain enough suitable, connected habitat to support resilient populations of jumping mouse."  81 Fed. Reg. at 14300.

In its final rule, the Service responded to each public comment. Many of the comments encouraged the Service to designate more land as critical habitat, while other comments raised doubts about whether the proposed areas satisfied the definition of critical habitat and questioned why the Service did not account for certain costs of designation.

Along with the final rule designating critical habitat, the Service published its final analysis of the economic impacts of the habitat designation. The analysis, which was performed by a private contractor, Industrial Economics, Inc. (IEc), included an assessment of the costs and benefits of designating critical habitat for the Jumping Mouse. Based on guidance from the U.S. Office of Management and Budget (OMB), IEc utilized a methodology known as the "baseline approach" to determine which costs must be included in the economic analysis. Under the baseline approach, the Service only considers costs that are "solely attributable to the designation of critical habitat" and ignores costs that would exist regardless of the habitat designation. App., Vol. 1 at 127. Thus, for example, if a cost is attributable to both the listing of a species as endangered and the designation of its critical habitat, then the Service would not consider the cost in its economic impact analysis. In accordance with this approach, IEc did not consider "any existing regulatory and socio-economic burden imposed on landowners, managers, or other resource users absent the designation of critical habitat" for the Jumping Mouse. *Id.*

The Service estimated the costs associated with critical habitat designation at $23 million.  The Service attributed a minor portion of those costs to future federal agency consultations, which the ESA requires for any federal action likely to destroy or adversely modify the critical habitat of an endangered or threatened species.  16 U.S.C. § 1536(a)(2).  The Service determined that most costs would arise from efforts to reduce the impact of livestock grazing on the Jumping Mouse's habitat.  During the rulemaking process, the Service recognized that livestock grazing presents a unique threat to the Jumping Mouse and its habitat because "cattle tend to concentrate their activity in riparian habitat."  Int.-App. at 195.  According to the Service, poorly managed grazing harms the Jumping Mouse by causing "trampling of streambanks, burrow collapse, loss of riparian cover, soil compaction, modification of riparian plant communities, lower[] water tables . . . a decline in herbaceous plant diversity, and a loss of riparian shrubs." *Id.*  To combat these harms, the Service anticipated costs for constructing cattle fences to steer livestock away from the Jumping Mouse's habitat, as well as the potential costs of reducing animal unit months[4] on U.S. Forest Service grazing allotments.  IEc also contemplated that ranchers who graze livestock in the critical habitat areas may need to shift their cattle rotation patterns or develop alternative water sources to minimize the degradation of the Jumping Mouse's riparian habitat.

---

[4]  An animal unit month is "the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month."  43 C.F.R. § 4100.0–5.

8

The Service has discretion under the ESA to exclude areas from the critical habitat designation if it determines that the benefits of exclusion outweigh the benefits of designation. In its final rule designating critical habitat for the Jumping Mouse, the Service explained that due to ongoing conservation partnerships, it would exclude 230 acres of tribal lands belonging to the federally recognized Isleta Pueblo and Ohkay Owingeh tribes. The Service did not exclude any areas from designation based on economic impact or other factors.

### B.  The Ranchers

The Northern New Mexico Stockman's Association and Otero County Cattleman's Association advocate on behalf of the livestock industry in New Mexico. Many of the associations' members (the Ranchers) have grazed cattle in New Mexico for generations. Some members can trace their ranching roots as far back as Spanish conquistador Don Juan de Oñate's colonization of the area in 1598.

The Ranchers graze cattle on federal land in New Mexico pursuant to renewable federal permits issued by the U.S. Forest Service. Several areas designated as critical habitat for the Jumping Mouse overlap with the Ranchers' grazing allotments. Stockman's Association members graze cattle in the Santa Fe National Forest, which is where Unit 3 of the critical habitat is located. Members of the Cattleman's Association graze their livestock in the Lincoln National Forest, which contains Unit 4 of the Jumping Mouse's critical habitat. Although the Ranchers do not own any private land in the designated habitat areas, their

9

federal ranching permits are tied to their private land or livestock, such that a sale of land or livestock may include the transfer of the associated grazing permit. *See* 36 C.F.R. § 222.3(c)(1).



The Ranchers fear that the designation of critical habitat for the Jumping Mouse will threaten their livelihoods through increased costs, changes that affect the health of their cattle, and lower property values.  The Ranchers raised these concerns during the Service's public comment periods and questioned the Service's analysis of the potential economic impacts on ranching activities.  The Service addressed ranching impacts in the final rule but decided not to exclude any of the Ranchers' allotments from the critical habitat designation.

In December 2018, the Ranchers filed a petition for review and complaint for declaratory and injunctive relief against the Service.[5]  The Ranchers argued

---

[5]  WildEarth Guardians and the Center for Biological Diversity later intervened in the case.

that the district court should vacate the critical habitat designation because the Service's economic analysis failed to comply with the ESA, the Service did not consider the impact of designation on the Ranchers' water rights, and the Service abused its discretion by not excluding Units 3 or 4 from the Jumping Mouse's critical habitat designation. The district court rejected the Ranchers' claims and denied their petition for review.

## II. Analysis

We affirm the denial of the Ranchers' claims. We conclude (1) the Service's economic impact methodology satisfies the ESA and does not violate our precedent; (2) the Service adequately assessed the impact of critical habitat designation on the Ranchers' water rights; and (3) the Service did not abuse its discretion when it declined to exclude Units 3 and 4 from the final critical habitat.

### A. Standing

Before proceeding to the merits of the Ranchers' arguments, we first address whether the Ranchers have standing to bring their claims. The Stockman's Association and Cattleman's Association claim they have standing to challenge the Service's designation of critical habitat because their members graze livestock on allotments that overlap with Units 3 and 4 of the Jumping Mouse's critical habitat. The Service admits the Cattleman's Association has standing but claims the Stockman's Association lacks standing because it did not show any injury from the designation of Unit 3 as critical habitat. The district

11

court concluded that both associations have standing to sue on behalf of their members.

We review the issue of standing de novo. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013). To establish standing under Article III of the Constitution, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). An association may bring claims on behalf of its members so long as "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977)).

We confine our analysis to the first prong of associational standing and whether the Ranchers have shown a cognizable injury. The Service does not dispute that the other elements of individual standing or associational standing have been met, and we agree those other elements are satisfied here.

12

The Stockman's Association contends the designation of Unit 3 as critical habitat decreases the value of its members' private property tied to the grazing allotments and imposes additional costs designed to prevent habitat degradation caused by cattle grazing. The Association claims that its members' declarations and the Service's own economic analysis sufficiently show that its members will suffer injury from the designation.

These allegations of injury are supported by the record and sufficient to confer standing. The Ranchers submitted declarations supporting their claims that members who graze cattle in allotments overlapping with Unit 3 have suffered and will continue suffering economic loss because of the critical habitat designation. Several members stated in their declarations that the designation of Unit 3 as critical habitat lowers members' property values due to the "negative perception" of land connected to allotments designated as critical habitat. App., Vol. 2 at 448, 458, 462, 467. The Supreme Court has recognized that a "decrease in the market value" of private land as a result of critical habitat designation is "a sufficiently concrete injury for Article III purposes." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 n.1 (2018).

The Service concedes that the Cattleman's Association has standing because the association submitted a detailed appraisal calculating the projected loss in property value for several of its members due to the critical habitat designation. Because the Stockman's Association did not file a similar appraisal, the Service contends the association lacks standing. But such evidence—while

13

helpful in determining the extent of an alleged injury—is not required to show that a plaintiff has suffered an injury for standing purposes. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) ("Our insistence upon these established requirements of standing does not mean that we would, as the dissent contends, 'demand . . . detailed descriptions' of damages.").

The Service's own economic analysis indicated that the designation of critical habitat could impact the value of private property attached to grazing allotments. The analysis concluded that "[p]ublic attitudes about the limits and costs that the [ESA] may impose can cause real economic effects to the owners of property, regardless of whether such limits are actually imposed." App., Vol. 1 at 114. Though the analysis did not examine the impact of habitat designation on the value of the Ranchers' privately owned property—which is outside the boundaries of Units 3 and 4—it included a description of three previous designations of critical habitat for other species that imposed costs on or decreased the value of neighboring private property. *See id.* at 114–15. The Service's recognition of the potential economic impact on the Ranchers' property supports our conclusion that the Ranchers' alleged injury is concrete and not "too speculative for Article III purposes." *See Lujan*, 504 U.S. at 564 n.2.

In addition to the imminent diminution in their property values, members of the Stockman's Association also described other injuries in their declarations. Many members commented that the designation of critical habitat makes the grazing permit process more costly and time-consuming and that fencing

14

constructed on their allotments to protect the Jumping Mouse's habitat impedes

their cattle's ability to access water.[6]  Like the reduction in property values, these

other injuries are "actual or imminent" and not "conjectural or hypothetical."  *Id.*

at 560 (internal quotation marks omitted).

In sum, we conclude both ranching organizations have associational

standing to challenge the critical habitat designation.

### B.  *Economic Analysis*

The Ranchers ask us to set aside the Service's designation of critical

habitat for the Jumping Mouse because the Service used an improper

methodology to calculate the economic impacts of designation.  The Ranchers

contend Section 4(b)(2) of the ESA requires the Service to analyze all the costs

associated with designation, even costs that can be attributed to other causes,

---

[6]  The Service dismisses the Stockman's Association's concerns about water access and animal unit month reductions in Unit 3 because "no allotment in Unit 3 will contain five percent or more critical habitat."  Serv. Aple. Br. at 42 (emphasis omitted).  In its economic analysis, IEc anticipated that ranchers who graze cattle in Unit 3 "will be able to shift grazing activities away from critical habitat areas at minimal cost without affecting the overall level of grazing within the allotment."  App., Vol. 1 at 130.  In response, the associations argue that the Service's proposed alternative methods of protecting critical habitat, such as shifting cattle rotation patterns and developing alternative water sources, will still injure their members by negatively impacting the health of their cattle.  They point out that grazing system changes and overhandling of cattle increases stress in the animals and leads to "lower weaning weights, increased calf losses and lower reproductive rates."  *Id.* at 65.  Testimony at the district court hearing revealed that these harms are not merely hypothetical—cattle lanes that had already been installed were reportedly "inadequate" and "create[d] congestion with the cattle," which causes stress and reduces the value of the livestock.  App., Vol. 5 at 981–82.

such as the listing of a species as endangered.  Because the Service only considered costs exclusively caused by the designation of critical habitat, the Ranchers claim the designation fails to comply with the ESA and Tenth Circuit precedent set out in *New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001).

The root of the Ranchers' argument lies in the different costs associated with the listing of a species versus the costs of designating critical habitat for the species.  Although the Secretary's listing and designation decisions are typically made in tandem, the Secretary must consider different factors for each determination under the ESA.

A brief review of the ESA explains the differences.  As an initial matter, the Service cannot consider economic factors when deciding whether to list a species.  Under 16 U.S.C. § 1533(b)(1)(A), the Secretary—who has delegated authority to the Service—must list a species as endangered or threatened "*solely on the basis of the best scientific and commercial data available*."  *Id.* (emphasis added); *N.M. Cattle Growers*, 248 F.3d at 1282.[7]  Once a species is listed, the

---

[7] In full: "The Secretary shall make determinations required by subsection (a)(1) *solely on the basis of the best scientific and commercial data* available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas."  16 U.S.C. § 1533(b)(1)(A) (emphasis added).

ESA makes it unlawful to harm or otherwise "take" the species.[8] *Id.*

§ 1538(a)(1)(B). Listing also triggers a consultation requirement for all federal

actions that may threaten a listed species. Under Section 7 of the ESA, federal

agencies must consult with the Service to "insure that any action authorized,

funded, or carried out by such agency . . . is not likely to jeopardize the continued

existence of any endangered species or threatened species." *Id.* § 1536(a)(2).

After the Service lists a species, it must also designate the species' critical

habitat necessary for conservation. *Id.* § 1533(a)(3)(A)(i). Critical habitat may

consist of areas occupied or unoccupied by the species, so long as the areas are

"essential to the conservation of the species." *Id.* § 1532(5)(A). Like listing, the

Service's designation of critical habitat must be based on the "best scientific data

available." *Id.* § 1533(b)(2). But unlike listing, the Service must consider the

impacts of designation. *Id.*; *Bennett v. Spear*, 520 U.S. 154, 172 (1997) (ESA

imposes a "categorical *requirement*" that the Secretary consider the impacts of

critical habitat designation). Section 4(b)(2) of the ESA requires that the Service

> tak[e] into consideration the economic impact, the impact
> on national security, and any other relevant impact, of
> specifying any particular area as critical habitat.

16 U.S.C. § 1533(b)(2).

---

[8] The ESA broadly defines "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

The economic costs associated with critical habitat designation typically include, among other things, administrative costs for Section 7 consultations.  As with federal actions that may jeopardize a species, Section 7 of the ESA mandates consultation when a federal action may "result in the destruction or adverse modification" of a listed species' habitat.  *Id.* § 1536(a)(2).  Other common economic impacts of designation, at play here, include the costs of implementing protective measures to avoid destruction or adverse modification of critical habitat, which may be borne by federal agencies or private parties operating pursuant to a federal action.[9]

The Ranchers argue that under Section 4(b)(2) of the ESA, the Service must analyze all the costs of designation regardless of whether habitat designation is the but-for cause of those costs.  Their argument arises out of our 2001 case, where we required an analysis of impacts "caused co-extensively by . . . other agency action (such as listing)."  *N.M. Cattle Growers*, 248 F.3d at 1283.  The Service disagrees with this reading of the ESA, arguing that the statute permits the Service to ignore all costs that would exist without the critical habitat designation and examine only those incremental costs that will be incurred because of the designation.  In other words, the baseline is listing and

---

[9]  While listing regulates certain private actions, such as activities that harm a listed species, "critical-habitat designation does not directly limit the rights of private [individuals]."  *Weyerhaeuser*, 139 S. Ct. at 365–66.  Instead, designation "places conditions on the *Federal Government's* authority to effect any physical changes to the designated area."  *Id.* (emphasis added).  Designation therefore does not impact private individuals or landowners unless a federal nexus exists.

18

only incremental costs above the baseline are considered when measuring the economic impact of habitat designation.

### 1. New Mexico Cattle Growers

The Ranchers' position is not without support. In 2001, we rejected the Service's use of the baseline approach to measure the economic impact of designating critical habitat for the endangered southwestern willow flycatcher. *Id.* at 1285–86. As the Ranchers point out, we specifically concluded "the baseline approach to economic analysis is not in accord with the language or intent of the ESA." *Id.* at 1285. Standing on its own, this language might foreclose the Service's argument here that the baseline approach is an acceptable application of Section 4(b)(2) of the ESA. But a careful review of *N.M. Cattle Growers* shows that we arrived at this conclusion only because of an implementing regulation in effect at the time—but since replaced—that resulted in the baseline approach rendering Section 4(b)(2) "virtually meaningless." *Id.*

When we decided *N.M. Cattle Growers*, the Service took the position that critical habitat designations were "unhelpful, duplicative, and unnecessary." *Id.* at 1283. This position can be traced to a regulation that gave actions likely to jeopardize a listed species the same meaning as actions likely to result in the adverse modification of an area designated as critical habitat. The similarities in definitions had a determinative effect on the Service's economic analysis of critical habitat designation. Using the baseline approach, the Service would commonly conclude that critical habitat designation had no economic impact.

19

This was so because any costs associated with protecting critical habitat from destruction or adverse modification (i.e., Section 7 consultations, preventative measures) were the same as the costs incurred for protecting the listed species from jeopardy. For instance, in its economic analysis of the willow flycatcher's critical habitat designation, the Service concluded that because all actions "that result in adverse modification of critical habitat will also result in a jeopardy decision, designation of critical habitat for the flycatcher is not expected to result in any incremental restrictions on agency activities." *Id.* at 1283–84 (quoting Division of Economics, U.S. Fish and Wildlife Service, *Economic Analysis of Critical Habitat Designation for the Southwestern Flycatcher*, S3 (1997)). We found this approach untenable in *N.M. Cattle Growers* because Section 4(b)(2) requires "some kind of consideration of economic impact in the [critical habitat designation] phase" and the identical standards for jeopardy and adverse habitat modification rendered "any purported economic analysis done utilizing the baseline approach virtually meaningless." *Id.* at 1285.

Because the Service did not consider the co-extensive costs of designating the Jumping Mouse's critical habitat, the Ranchers contend the designation directly conflicts with *N.M. Cattle Growers*. But the Ranchers fail to take into account that the problem we identified in *N.M. Cattle Growers* has since been remedied. Shortly after we decided the case, the Fifth and Ninth Circuits nullified the regulatory definition of "destruction or adverse modification" of

20

habitat.[10]  *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 443 (5th Cir. 2001); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004).  Following the nullification, the Service promulgated a new regulation that modified the regulatory meaning of "destruction or adverse modification" of habitat.  50 C.F.R. § 402.02 (2016).  Rather than encompassing only actions that affect the survival and recovery of a species, as the jeopardy standard already does, the amended definition of habitat modification covers actions that affect the conservation of a species, which makes the definition broader in scope and effectively addresses our criticism in *N.M. Cattle Growers*.  *Compare* 50 C.F.R. § 402.02 ("Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."), *with id.* ("Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.").

Our conclusion in *N.M. Cattle Growers* that the baseline approach did not comply with the ESA was based solely on the regulatory definitions in effect at

---

[10]  Although we acknowledged in *N.M. Cattle Growers* that the regulatory definitions of "destruction or adverse modification" and "jeopardy" had "been the cause of much confusion," we did not resolve the conflict because the issue was not before us.  248 F.3d at 1283.

the time: "Because economic analysis done using the [Service]'s baseline model is rendered essentially without meaning *by 50 C.F.R. § 402.02*, we conclude Congress intended that the [Service] conduct a full analysis of all of the economic impacts of a critical habitat designation." 248 F.3d at 1285 (emphasis added). The Service's amended definition of "destruction or adverse modification" corrects this problem. Under the new definition, costs associated with adverse modification are not equivalent to jeopardy costs. An action that jeopardizes a species is one that affects the "survival and recovery" of a listed species "by reducing the reproduction, numbers, or distribution of that species," while an action that adversely modifies habitat is one that "diminishes the value of critical habitat for the conservation of a listed species." 50 C.F.R. § 402.02. In short, a plain reading of these definitions shows that adverse modification of habitat is no longer "subsumed" within the jeopardy definition. *See N.M. Cattle Growers*, 248 F.3d at 1283.

The Service's designation of critical habitat for the Jumping Mouse shows how the agency's cost analysis has changed and how the baseline approach does not render the ESA's economic impact requirement "meaningless" anymore. *Id.* at 1285. Although the Service used the baseline approach, it determined there were measurable economic costs attributable solely to the designation of critical habitat. Unlike the Service's economic analysis for the southwestern willow flycatcher in *N.M. Cattle Growers*, which found there were no incremental costs resulting from designation, the Service's economic assessment here determined

there were $23 million in economic costs associated with the designation of the Jumping Mouse's critical habitat. Thus, the Service's revised definition of "destruction or adverse modification" remedies the problem we identified in *N.M. Cattle Growers* and the decision does not apply here.

According to the Ranchers, the baseline approach still renders Section 4(b)(2) meaningless in occupied areas because the Service routinely attributes all costs in those areas to the presence of the listed species rather than the designation of the areas as critical habitat. The Ranchers argue that this problem is "made worse by the Service's loose standards for designating occupied critical habitat." Aplt. Br. at 27 n.2 (citing *N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1227 (10th Cir. 2020)). We are satisfied that the Service's newly adopted regulatory definition of "destruction or adverse modification" of habitat addresses the Ranchers' concerns. As the Service points out, the overlap in costs between listing and habitat designation in certain cases "reflects the reality that for some species [like the Jumping Mouse,] adversely modifying areas where the species lives *does* jeopardize the species' survival." Serv. Aple. Br. at 32. It may be true that in situations where critical habitat consists only of occupied areas, there will be few incremental costs attributable to critical habitat designation. But those are not the facts before us. In this case, the Service designated both occupied and unoccupied areas as critical habitat and found there were $23 million in costs associated with the habitat designation. Thus, the Service's use of the baseline approach here clearly did not render

23

Section 4(b)(2) meaningless.  If in some future case, a private party believes the Service improperly designated areas as occupied critical habitat or misattributed costs to listing, then the party can challenge that designation under the Administrative Procedure Act.  *See Weyerhaeuser*, 139 S. Ct. at 370.

### 2. Baseline Approach

The Ranchers argue that even if *N.M. Cattle Growers* does not apply, the Service's use of the baseline approach still violates Section 4(b)(2) of the ESA. They say this is because the statute itself requires the Service to analyze all the costs of designating critical habitat, even costs that would exist regardless of the critical habitat designation, such as costs associated with the listing of a species. By applying the baseline approach, the Ranchers contend the Service underestimated the costs associated with designating the Jumping Mouse's critical habitat.  In response, the Service argues that the baseline approach is a reasonable application of Section 4(b)(2)'s economic impact analysis requirement.  The Service further contends that its decision to use the baseline approach should be given deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), because the agency codified the baseline approach through formal rulemaking in 2013.  *See* 78 Fed. Reg. 53058 (2013).[11]

---

[11]  The Ranchers claim that our decision in *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142 (10th Cir. 2016), bars the Service from applying its 2013 baseline approach regulation in this circuit until we expressly overrule *N.M. Cattle Growers*.  While *Guiterrez-Brizuela* primarily concerned a retroactive application of an agency rule, we explained that when an agency adopts an interpretation of a statute that (continued . . .)

The district court rejected the Service's *Chevron* argument. Relying on our precedent, the court explained that *Chevron* only applies to legislative rules and that the substance of the Service's rule makes it an interpretative rule rather than a legislative rule.

We agree with the district court that *Chevron* deference is not warranted here. The Service's rule endorsing the baseline approach is an interpretive rule to which *Chevron* does not apply. *See United States v. Mead Corp.*, 533 U.S. 218, 232 (2001) (interpretive rules "enjoy no *Chevron* status as a class"); *Aposhian v. Barr*, 958 F.3d 969, 979–80 (10th Cir. 2020) (rule is interpretive if it "attempts to clarify an existing rule but does not change existing law, policy, or practice" and "simply advises the public of the agency's construction of the statute and rules which it administers" (cleaned up)). Although the rule was promulgated through formal rulemaking, that alone does not entitle the agency's interpretation to deference under *Chevron*. The rule did not change existing policy or practice because the Service regularly used the baseline approach in states outside this circuit. App., Vol. 5 at 1031. Moreover, the agency's explanation in the final

---

directly conflicts with judicial precedent, the agency "may enforce its new policy judgment only with judicial approval." *Id.* at 1145 (quoting *De Niz Robles v. Lynch*, 803 F.3d 1165, 1174 n.7 (10th Cir. 2015)). But as we previously explained, the Service's use of the baseline approach in this instance does not directly conflict with *N.M. Cattle Growers* because that decision was based on the Service's problematic conflation of the costs of jeopardizing a species with the costs of adverse modification of habitat. Because the adverse modification definition was later nullified by other courts and modified by the Service, the Service's formal adoption of the baseline approach did not overrule *N.M. Cattle Growers*.

25

rule shows that this is a mere clarification of an existing practice and that the purpose of the rule is to advise affected parties of the agency's construction of the ESA. As the preamble to the rule states,

> [W]e revise 50 CFR 424.19 to *clarify* the instructions for . . . considering the impacts of critical habitat designations, and considering exclusions from critical habitat. . . . *[T]hese revisions will not change how we implement the Act; rather, the revisions serve to codify the current practices of the agencies*.

78 Fed. Reg. at 53058 (emphasis added).[12] Based on this description of the rule and the fact that the Service routinely used the baseline approach prior to its formal adoption of the methodology, we conclude the Service's rule is not entitled to deference under *Chevron*.

Because *Chevron* does not apply, we review the Service's interpretation of the ESA under the standard set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Mead*, 533 U.S. at 237–38. *Skidmore* review of an agency action depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." 323 U.S. at 140. We also recognize that the "latitude the ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes

---

[12] Despite this statement in the rule, the Service still argues that the final rule "marks a change in existing agency practice." Serv. Aple. Br. at 24 n.6. The Service offers no support for this contention other than the substance of the final rule itself, which plainly describes the rule's effect as a codification of existing practice.

that we owe some degree of deference to the Secretary's reasonable interpretation" of the statute. *Nat'l Ass'n of Home Builders*, 551 U.S. at 665 (quoting *Babbitt v. Sweet Home Chapter of Communities for a Great Ore.*, 515 U.S. 687, 703–04 (1995)).

Before examining the agency's interpretation of the statute, we first look to its text to determine whether Congress has already addressed the question at issue. *Kientz v. Comm'r, SSA*, 954 F.3d 1277, 1280 (10th Cir. 2020). The issue before us is whether the ESA requires the Service to use or not use a particular methodology in its economic impact analysis of critical habitat designation. The relevant portion of Section 4(b)(2) of the ESA reads as follows:

> The Secretary shall designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat.

16 U.S.C. § 1533(b)(2). Because the statute only commands the Service to conduct an economic impact analysis and does not prescribe the exact methodology that must be used, we agree with the Service that the ESA does not "clear[ly] and unambiguous[ly]" address the suitability of the baseline approach. *See Wedelstedt v. Wiley*, 477 F.3d 1160, 1165 (10th Cir. 2007). We may therefore consider whether the agency's interpretation of the statute is permissible.

The Service contends the baseline approach is a reasonable application of Section 4(b)(2)'s economic impact requirement. Recall that the baseline

approach adopts a "but for" causation requirement in that it "moves any economic impact that can be attributed to listing [or other causes] below the baseline and, when making the [critical habitat designation], takes into account only those economic impacts rising above the baseline." *N.M. Cattle Growers*, 248 F.3d at 1280.

The baseline approach is consistent with Section 4(b)(2), which requires the Service to consider "the economic impact . . . of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Under the plain language of the provision, the only costs that must be considered by the Service are the costs related to the designation of critical habitat. A reasonable way to determine those costs is to "compare the hypothetical world with the designation to the hypothetical world without the designation"—i.e., the baseline approach. 78 Fed. Reg. at 53062. Examining other costs that would exist regardless of designation does not support the Secretary's goal of determining whether to designate or exclude an area as critical habitat.[13] Such an approach would also be inconsistent

---

[13] The Ninth Circuit and several district courts have upheld the baseline approach as a reasonable interpretation of Section 4(b)(2). *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1173 (9th Cir. 2010) ("The very notion of conducting a cost/benefit analysis is undercut by incorporating in that analysis costs that will exist regardless of the decision made."); *Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1371 (N.D. Fla. 2009) ("[T]he baseline approach is a reasonable method, consistent with the language and purpose of the ESA, for assessing the actual costs of a particular critical habitat designation. . . . Costs that exist independently of the critical habitat designation cannot be costs 'of specifying any particular area as critical habitat.'"); *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 130 (D.D.C. 2004) ("To find the true cost (continued . . .)

with OMB guidance, which directs agencies to "measure the costs and benefits of a regulatory action against a baseline."  App., Vol. 1 at 127 (citing OMB, Circular A-4 (Sept. 17, 2003)).

We are not persuaded by the Ranchers' argument that the ESA requires the Service to consider the costs of listing when examining the economic impact of critical habitat designation.  The Ranchers cannot logically argue that the ESA forbids the Service from considering economic costs when making a listing determination, Aplt. Br. at 20, but *requires* the Service to consider those costs when making a decision that has no impact on listing.  *See N.M. Cattle Growers*, 248 F.3d at 1284 ("[T]he ESA clearly bars economic considerations from having a seat at the table when the listing determination is being made.").[14]  As the Ninth Circuit has explained, it would "be strange to conclude that Congress intended to use the critical habitat designation to require the agency to consider the previously irrelevant costs of listing the species, particularly given that the

---

of a designation, the world with the designation must be compared to the world without it.").

[14]  The Ranchers claim that the costs of listing should be taken into account when designating habitat because critical habitat designation increases the likelihood that one will commit a taking in violation of the ESA, citing *Babbitt*, 515 U.S. at 691, for support.  The Ranchers read *Babbitt* as holding that the government can prove a violation of the take provision "solely by demonstrating habitat modification."  Aplt. Br. at 22.  But *Babbitt* does not stand for this proposition.  The regulation at issue in *Babbitt*—which the Court held was reasonable— defined the ESA's take provision to include "significant habitat modification or degradation where it *actually kills or injures wildlife*."  515 U.S. at 690 (emphasis added).  The qualifying phrase regarding the actual killing of wildlife makes it clear that habitat modification on its own does not constitute a taking.

decision to exclude an area from critical habitat for economic reasons is discretionary." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1173 (9th Cir. 2010). Other than giving effect to statutory language—a problem that has been corrected since *N.M. Cattle Growers*—there is simply no reason why the Service should consider certain costs only to subtract them later in the process.

We therefore conclude the baseline approach complies with Section 4(b)(2) of the ESA.

### C. Impact on Water Rights

The Ranchers next contend that even if the baseline approach is permissible, the Service failed to properly account for the economic impact of critical habitat designation on the Ranchers' water rights. According to the Ranchers, the Service "ignored these costs because of a mistaken assumption that ranchers cannot own water rights within the National Forest." Aplt. Br. at 14. The district court ruled in favor of the Service on this issue, finding the Service's economic assessment to be reasonable. The court also concluded that the Ranchers did not provide any evidence to show that the designation of critical habitat might result in a taking of the Ranchers' water rights. Because the costs associated with a potential taking were too speculative, the court found it reasonable for the Service not to include such costs in its economic analysis.[15]

---

[15] The Ranchers ask us to vacate the parts of the district court's order where the court purported to adjudicate the status of the Ranchers' grazing and water rights on federal lands. We decline to do so because the district court clarified its order (continued . . .)

Our review is guided by the Administrative Procedure Act.  We must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  We owe the district court no deference in assessing agency actions under the APA.  *N.M. Farm & Livestock Bureau*, 952 F.3d at 1221.

After a close review of the administrative record, we conclude the Service adequately considered the impact of critical habitat designation on the Ranchers' water rights.  In its final critical habitat rule, the Service described the ways in which it considered the specific impacts of designation on grazing and water access.  For example, the Service acknowledged that cattle guards and fencing may impede access to water and that the Forest Service may need to develop alternative water sources or shift cattle grazing patterns.  The Service also accounted for a potential reduction in animal unit months due to grazing changes or restricted access to water.  Rather than ignoring those costs, the Service expressly incorporated the costs into its economic impact analysis.  *See* 81 Fed. Reg. at 14287 ("[W]e incorporate costs associated with the development of

---

after the Ranchers filed a motion under Fed. R. Civ. P. 59(e) to alter or amend the judgment.  The court explained that its ruling is limited to the administrative record before it and that the court is not adjudicating "the status of the Associations' members' grazing rights in another case on another record or whether, in an open-record action, the Associations' members could successfully assert a claim for just compensation for the taking of their water rights." *See* App., Vol. 5 at 972–73.  Because the district court adequately addressed the Ranchers' concerns, we need not vacate the district court's order.

31

alternative water sources for cattle based on information provided by the Forest Service.").

The record demonstrates that the Service not only considered the impacts of designation on the Ranchers' water rights, but also that the agency planned for measures to ensure the Ranchers would continue to have access to water on their federal allotments.  While we will set aside an agency decision if the agency "entirely failed to consider an important aspect of the problem," here the Service plainly took the impact on water rights under consideration when determining critical habitat.  *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In addition to considering the impact of designation on the Ranchers' access to water, the Service also conducted a separate analysis to determine whether designation would result in any takings of private property.  This assessment was conducted in accordance with Executive Order 12630, which requires agencies to avoid unnecessary takings and to assess any potential takings implications of federal actions.  The Service concluded that because the "critical habitat protection requirements apply only to Federal agency actions, few conflicts between critical habitat and private property rights should result from this designation."  81 Fed. Reg. at 14314.

The Ranchers argue the agency underestimated the economic impacts of critical habitat designation because it did not consider the costs associated with

32

taking the Ranchers' water rights. To be sure, the Service's takings assessment focused solely on the designation's impact on *private property* and did not assess whether the designation of critical habitat would constitute a taking of the Ranchers' water rights on *federal* land. In fact, the Service expressly stated in the final rule that it "did not conduct an analysis of privately owned water rights because it is beyond the scope of the environmental assessment and economic analysis." *Id.* at 14275. But as the district court explained, the Ranchers provided no information during the rulemaking process upon which the Service could have concluded that the Ranchers possess private water rights in Units 3 and 4 and that a taking of those rights was likely to occur. The Ranchers also failed to submit evidence to support an accurate assessment of the costs of such a taking (i.e., the economic value of the Ranchers' water rights). Instead, the Ranchers vaguely asserted without any support that the designation of critical habitat would result in "the loss of the stock water rights that we ranchers own in these allotments" and the "ability to make beneficial use of the water." App., Vol. 1 at 151. The Service could not have discerned from these bare assertions that the Ranchers possess vested water rights, the infringement of which would rise to the level of a taking that must be compensated by the government and included in the Service's economic impact analysis. And as the final rule makes clear, the Service anticipates that measures will be implemented to ensure the Ranchers' cattle have continued access to water in the allotments.

33

As we previously explained, the ESA does not require the Service to analyze *all* economic impacts—no matter how speculative—of designating critical habitat.  Indeed, the ESA clearly bestows discretion upon the administrators of the statute to assess costs.  16 U.S.C. § 1533(b)(2); *Weyerhaeuser*, 139 S. Ct. at 371.  Given the Service's broad discretion to consider economic costs and the Ranchers' lack of evidence in the record showing that designation constitutes a taking of their property rights, we conclude the Service adequately assessed the economic impacts on the Ranchers' water rights.

### D. Exclusion

The Ranchers' final argument is that the Service abused its discretion when it decided not to exclude Units 3 and 4 from the critical habitat designation.  The Ranchers claim the Service failed to provide a reasoned basis for its decision and did not explain how it weighed the costs and benefits of exclusion.  The district court concluded the Ranchers administratively waived this argument by not presenting it to the Service during the rulemaking process.  The court nonetheless examined the merits of the Ranchers' argument and determined that the Service did not abuse its discretion when it made its exclusion decision.

We assume without deciding that the Ranchers preserved their challenge to the non-exclusion of Units 3 and 4.  Our review of the Ranchers' argument is once again guided by the APA.  5 U.S.C. § 706(2)(A); *Weyerhaeuser*, 139 S. Ct.

34

at 371 (an agency's decision to exclude critical habitat is subject to judicial review under the APA).

After it conducted its economic impact analysis, the Service decided to exclude only two proposed subunits, 6A and 6B, from the critical habitat designation. Those subunits were excluded because the Service determined that existing conservation partnerships with tribes in those areas were sufficient to protect the Jumping Mouse's habitat. The Service explained that no areas would be excluded from critical habitat designation based on economic impacts because the Service "did not identify any disproportionate costs that are likely to result from the designation." 81 Fed. Reg. at 14307.

The Ranchers claim the Service's decision not to exclude Units 3 and 4 based on economic impacts was "fatally vague" and the agency provided no standard or explanation for how it weighed the benefits and costs of designation. Aplt. Br. at 45. Although the Ranchers acknowledge that the Service examined the costs of designating critical habitat, the Ranchers contend the agency did not explain "what it would weigh those costs against." *Id.*

Our analysis begins as always with the text of the ESA, which gives the Secretary discretion to exclude areas from critical habitat designation:

> The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

35

16 U.S.C. § 1533(b)(2).  In interpreting the ESA's exclusion provision, the Supreme Court has explained that the "use of the word 'may' certainly confers discretion on the Secretary."  *Weyerhaeuser*, 139 S. Ct. at 371; *see also Babbitt*, 515 U.S. at 708 ("When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary.").  When Congress gives an agency broad discretionary authority, "we are especially reluctant to substitute our views of wise policy."  *Babbitt*, 515 U.S. at 708.  But "[i]t is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett*, 520 U.S. at 172.

The Service did not abuse its discretion when it decided not to exclude Units 3 and 4 from the critical habitat designation.  The record shows that the agency considered the benefits of exclusion and weighed those against the benefits of inclusion.  Even though the agency did not describe in detail how it ultimately weighed the competing benefits, we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (internal citations and quotation marks omitted).

In the final rule designating critical habitat for the Jumping Mouse, the Service explained that conservation benefits are of paramount importance when deciding whether to include or exclude an area as critical habitat.  For instance,

36

the main advantages of inclusion are the additional conservation benefits "from the protection from adverse modification or destruction as a result of actions with a Federal nexus" and educational benefits that derive from the recovery of a listed species. 81 Fed. Reg. at 14307. Similarly, the Service's view that an area warrants exclusion is based on "whether exclusion of a specific area is likely to result in conservation; the continuation, strengthening, or encouragement of partnerships; or implementation of a management plan that provides equal to or more conservation than a critical habitat designation would provide." *Id.*

The Service assessed these same benefits when it decided whether to exclude certain areas from the Jumping Mouse's critical habitat. Specifically, the Service projected the following benefits of including an area in the Jumping Mouse's critical habitat:

- Improved conservation of the Jumping Mouse through expansion of critical habitat

- Reduced grazing, fencing, and surveys to support habitat preservation

- Improved water and soil quality

- Benefits to ecosystem health for coexisting species

- Educational benefits of mapping essential habitat for recovery of the listed species

App., Vol. 1 at 141–42. The Service also detailed the costs of including an area in critical habitat, such as expenses related to the installation of cattle fencing,

37

potential animal unit month reductions, additional Section 7 consultation requirements, and impacts on private property values.

While the Service anticipated many benefits from inclusion, the Service estimated that there would be few benefits related to exclusion, especially in areas that lacked a current conservation plan to protect the Jumping Mouse's habitat. In response to a public comment requesting that subunit 3C be excluded, the Service explained that it decided to include the area because there were no conservation plans in place to protect the Jumping Mouse's habitat in the subunit. It also explained that impacts to the human environment were unlikely and that the estimated costs associated with grazing and Section 7 consultations in subunit 3C amounted to only $3.4 million annually. 81 Fed. Reg. at 14279–80. The Service ultimately determined that its "final economic analysis did not indicate any disproportionate economic impacts resulting from the designation." *Id.* at 14283. The Service also concluded that total costs of critical habitat designation would only be $23 million, well below the Service's benchmark of $100 million.[16]

Based on the Service's description of the benefits of inclusion and exclusion, we disagree with the Ranchers that the agency's reasoning for not

---

[16] The $100 million figure comes from Executive Order 12866, which defines "significant regulatory action" as "any regulatory action that is likely to result in a rule that may: (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities."

excluding Units 3 and 4 was "fatally vague."  Although the Service did not quantitatively assess the benefits of inclusion, the agency's economic analysis included a qualitative assessment of the benefits, as permitted by regulation.  *See* 50 C.F.R. § 424.19(b) ("Impacts may be qualitatively or quantitatively described.").

The Ranchers also take issue with how the Service reached its final exclusion determination, arguing that the agency failed to explain precisely how it weighed the benefits and costs of exclusion.  Again, we disagree.  The administrative record shows that the Service assigned the greatest weight to the conservation benefits of including an area in critical habitat while generally disregarding the potential economic benefits of exclusion.  Although the Ranchers might not agree with how the Service weighed the competing benefits, the Service has discretion in deciding whether to exclude an area and the Service's decision to elevate conservation concerns over other factors is in keeping with the overall purpose of the ESA.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost.").

The conservation benefits of including more areas in the critical habitat designation are also particularly important for the Jumping Mouse, which has "exceptionally specialized habitat requirements" and is highly dependent on its habitat for survival.  Int.-App. at 110.  Furthermore, as the Service notes throughout the final rule, livestock grazing can significantly degrade the Jumping

Mouse's critical habitat.  81 Fed. Reg. at 14275 ("[C]ompared to other forms of habitat loss, grazing has the greatest potential for negative impacts on the jumping mouse and riparian habitat.").  Taken together, these findings show that the Service determined the conservation benefits of inclusion were substantial while the benefits of exclusion were minimal.

We therefore conclude that the Service did not abuse its discretion when it decided not to exclude Units 3 and 4 from the critical habitat designation.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of the Ranchers' petition for review.