20-1641-ag
*Garcia v. Garland*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2021
No. 20-1641

**ANTONIO LUNA GARCIA,**
*Petitioner*,

v.

**MERRICK B. GARLAND,**
**UNITED STATES ATTORNEY GENERAL,**
*Respondent*.

On Petition for Review of an Order of
the Board of Immigration Appeals

ARGUED: SEPTEMBER 14, 2021
DECIDED: MARCH 31, 2023

Before: WALKER, NARDINI, and MENASHI, *Circuit Judges*.

Antonio Luna Garcia petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial of his request for administrative closure of his removal proceedings. The agency relied on *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), a then-controlling decision of the Attorney General that prohibited

administrative closure. The Attorney General subsequently overruled that decision and revised the agency's position. *See Matter of Cruz-Valdez*, 28 I. & N. Dec. 326 (A.G. 2021). We deny the petition for review. First, we hold that an agency does not abuse its discretion by relying on an interpretation of its regulations that is controlling at the time of its decision—even if the agency subsequently revises that interpretation—as long as it reflects a reasonable interpretation of the regulations. Second, we conclude that the regulations in this case are at least ambiguous with respect to the availability of administrative closure and that *Matter of Castro-Tum* expressed a reasonable interpretation of the regulations that is entitled to deference. Third, we agree with the BIA that *Matter of Castro-Tum* did not authorize administrative closure in this case.

---

BIBIANA C. ANDRADE, New York, NY, *for Petitioner*.

COLIN J. TUCKER, Trial Attorney, Office of Immigration Litigation (Brian Boynton, Acting Assistant Attorney General, Civil Division, Greg D. Mack, Senior Litigation Counsel, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Washington, D.C., *for Respondent*.

---

MENASHI, *Circuit Judge*:

Petitioner Antonio Luna Garcia seeks review of a decision of the Board of Immigration Appeals ("BIA" or the "Board") affirming the denial of his request for administrative closure of his removal proceedings. In denying the request, the agency relied on *Matter of*

2

*Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), a then-controlling decision of the Attorney General that held that the regulations governing immigration adjudications did not allow immigration judges or the BIA to apply administrative closure except in narrow circumstances. The Attorney General has since overruled *Matter of Castro-Tum. See Matter of Cruz-Valdez*, 28 I. & N. Dec. 326 (A.G. 2021). As a result, this appeal presents the question of whether an agency abused its discretion when it relied on an interpretation of its regulations that was controlling at the time of its decision but that the agency has since modified. Even if it was not an abuse of discretion to apply an agency interpretation that has since changed, Garcia argues that *Matter of Castro-Tum* conflicted with the regulations it purported to interpret, and therefore the agency erred in applying that interpretation at any time. Garcia further argues, in the alternative, that even if *Matter of Castro-Tum* reflected a reasonable interpretation of the regulations, it nevertheless permitted administrative closure in his case. The agency, he argues, incorrectly interpreted *Matter of Castro-Tum* when it held otherwise.

We deny the petition for review. First, we hold that an agency does not abuse its discretion by relying on an interpretation of its regulations that is controlling at the time of its decision—even if the agency subsequently revises that interpretation—as long as it reflects a reasonable interpretation of the regulations. Second, we conclude that the regulations in this case are at least ambiguous with respect to the availability of administrative closure and that *Matter of Castro-Tum* expressed a reasonable interpretation of the regulations that is entitled to deference. Third, we agree with the BIA that *Matter of Castro-Tum* did not authorize administrative closure in this case.

# BACKGROUND

## I

An immigration judge ("IJ") conducts removal proceedings to determine whether an alien is "removable from the United States." 8 U.S.C. § 1229a(c)(1)(A). But rather than proceed to a final decision, the IJ might "administratively close" the proceedings. *Matter of W-Y-U-*, 27 I. & N. Dec. 17, 18 (B.I.A. 2017). Administrative closure does not terminate the case. Rather, it "temporarily remove[s] a case from an Immigration Judge's active calendar or from the [BIA's] docket." *Matter of Avetisyan*, 25 I. & N. Dec. 688, 692 (B.I.A. 2012). Such closure might be used "to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time." *Id. But see Matter of Castro-Tum*, 27 I. & N. Dec. at 272 ("Although described as a temporary suspension, administrative closure is effectively permanent in most instances.").

No statute or regulation expressly authorizes IJs or the BIA to employ administrative closure. *See Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 889 (9th Cir. 2018) ("Although [administrative closure] is regularly used, it is not described in the immigration statutes or regulations."); *Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010) ("[A]dministrative closure is not a practice specified in the statute, nor is it mentioned in the current regulations."). Instead, agency adjudicators have inferred that authority from broad regulatory language that authorizes IJs, "[i]n deciding the individual cases before them, and subject to the applicable governing standards," to "take any action consistent with their authorities under the [Immigration and Nationality] Act and regulations that is appropriate and

4

necessary for the disposition of such cases," 8 C.F.R. § 1003.10(b) (2018), and that authorizes the BIA, "[s]ubject to these governing standards," to "take any action consistent with their authorities under the Act and the regulations that is appropriate and necessary for the disposition of the case," *id.* § 1003.1(d)(1)(ii). *See Matter of Avetisyan*, 25 I. & N. Dec. at 693.

In 1990, the BIA held that "the administrative closing procedure should not be used if it is opposed by either party to the proceedings." *Matter of Munoz-Santos*, 20 I. & N. Dec. 205, 207 (BIA 1990); *see also Matter of Gutierrez-Lopez*, 21 I. & N. Dec. 479, 480 (BIA 1996) ("A case may not be administratively closed if opposed by either of the parties."). The BIA did not further address administrative closure between 1996 and 2012.[1] It revised its position in *Matter of Avetisyan*, in which the BIA decided that the limitations its precedent put on the use of administrative closure "directly conflict[ed] with the delegated authority of the Immigration Judges and the Board and their responsibility to exercise independent judgment and discretion in adjudicating cases and to take any action necessary and appropriate for the disposition of the case." 25 I. & N. Dec. at 693. In place of its previous rule, the BIA decided that IJs or the BIA should "weigh all relevant factors" when considering a request for administrative closure. *Id*. at 696. Five years later, in *Matter of W-Y-U-*, the BIA narrowed this holding. In that case, the Department of Homeland Security requested administrative closure, but the alien objected because it would have prevented him from pursuing his asylum application. *See* 27 I. & N. Dec. at 17. The BIA sided with the

---

[1] *See* Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. Forum 567, 571-72 (2020).

alien, clarifying that, when a party opposes administrative closure, "the primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits." *Id.* at 20.

The next year, in *Matter of Castro-Tum*, the Attorney General overruled *Matter of Avetisyan* and *Matter of W-Y-U-*.[2] Attorney General Sessions said that *Matter of Avetisyan* departed from "decades" of precedent limiting administrative closure. 27 I. & N. Dec. at 273. He explained that "[g]rants of general authority to take measures 'appropriate and necessary for the disposition of such cases' would not ordinarily include the authority to suspend such cases indefinitely. Administrative closure in fact is the antithesis of a final disposition." 27 I. & N. Dec. at 285 (quoting 8 C.F.R. § 1003.10(b) (2018)). The Attorney General decided that "[u]nlike the power to grant continuances, which the regulations expressly confer, immigration judges and the Board lack a general authority to grant administrative closure. No Attorney General has delegated such broad authority, and legal or policy arguments do not justify it." *Id.* at 282-83. Accordingly, the Attorney General held that "immigration

---

[2] The Attorney General is authorized to "establish such regulations, … issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his oversight of the Executive Office for Immigration Review, the component of the Department of Justice that conducts removal proceedings. 8 U.S.C. § 1103(g)(2). In line with that authority, BIA decisions may be referred for the Attorney General's review. 8 C.F.R. § 1003.1(h)(1) (2018).

judges and the Board lack this authority except where a previous regulation or settlement agreement has expressly conferred it." *Id.* at 283.

After the decision of the BIA in this case, the Attorney General overruled *Matter of Castro-Tum*. Attorney General Garland said that he had "determined that it is appropriate to overrule Attorney General Sessions's opinion in *Castro-Tum*" because it "departed from long-standing practice" and had been rejected by some courts. *Matter of Cruz-Valdez*, 28 I. & N. Dec. at 328-29. He explained that the Department of Justice had effectively codified *Castro-Tum* by regulation,[3] but the Department was reconsidering those regulations, and while "the reconsideration proceeds and except when a court of appeals has held otherwise, immigration judges and the Board should apply the standard for administrative closure set out in *Avetisyan* and *W-Y-U-*." 28 I. & N. Dec. at 329.

## II

Antonio Luna Garcia wants to become a lawful permanent resident of the United States. But in March 2014, Garcia was served with a notice to appear before an IJ because of his illegal entry and presence in the United States since 1999. The notice to appear informed Garcia that he was subject to removal under 8 U.S.C.

---

[3] Those regulations were issued subsequent to the decision of the BIA in this case. *See Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 85 Fed. Reg. 81,588, 81,651, 81,655 (Dec. 16, 2020) (amending 8 C.F.R. §§ 1003.1(d)(1)(ii), 1003.10(b)). We therefore do not consider those regulations in this appeal. This opinion relies on the 2018 edition of the Code of Federal Regulations, which contains the operative regulations at the time of the IJ and BIA decisions in this case and at the time the Attorney General decided *Matter of Castro-Tum*.

§ 1182(a)(6)(A)(i) because he was not properly admitted and had not been paroled.

After Garcia received the notice to appear, his wife—a U.S. citizen—filed an I-130 Petition for Alien Relative. U.S. Citizenship and Immigration Services ("USCIS") approved that petition, thereby establishing that Garcia is the husband of a U.S. citizen. Establishing this sort of family relationship is the first step to obtaining lawful permanent resident status. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *id.* § 1154(a)(1)(A)(i); *see also Neang Chea Taing v. Napolitano*, 567 F.3d 19, 21 (1st Cir. 2009) (describing the process of obtaining lawful permanent resident status on the basis of a family relationship). Still, the notice of approval included a disclaimer that the approval of the I-130 petition did not constitute a visa and that the Department of Homeland Security ("DHS") still retained the authority to pursue removal proceedings against Garcia.[4]

Garcia still needed to seek adjustment of his status through the filing of an I-485 application. *See* 8 U.S.C. § 1255; *see also Neang Chea*

---

[4] The notice read: "Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives on record will be provided an opportunity to address derogatory information before formal proceeding is initiated." J. App'x 54.

8

*Taing*, 567 F.3d at 21. Adjustment of status is available for "an alien who was inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a). But because he entered the United States illegally, Garcia was neither admitted nor paroled into the United States. Accordingly, he needed to return to his country of origin, Mexico, to apply for an immigrant visa from the U.S. consulate. Yet because Garcia had been "unlawfully present in the United States for one year or more," he would be unable to reenter the United States if he sought "admission within 10 years of the date of [his] departure … from the United States." 8 U.S.C. § 1182(a)(9)(B)(i)(II). To be able to return to the United States from Mexico within ten years, Garcia needed to submit an I-212 Application for Permission to Reapply for Admission and an I-601A Application for Provisional Unlawful Presence Waiver before leaving the country. *See* 8 U.S.C. § 1182(a)(9)(B)(v).[5]

Garcia did not believe that he could be approved for an I-601A waiver while he was also subject to ongoing removal proceedings. DHS regulations provide that "an alien is ineligible for a provisional unlawful presence waiver … if … [t]he alien is in removal proceedings, in which no final order has been entered, unless the

---

[5] *See Villavicencio Calderon v. Sessions*, 330 F. Supp. 3d 944, 957 (S.D.N.Y. 2018) ("DHS's regulations permit an eligible alien to obtain a provisional waiver in three steps. *First*, the alien's U.S. citizen relative (*e.g.,* a spouse) files a Form I-130 'Petition for Alien Relative' to request that the Government recognize the alien as the citizen's immediate relative. *See* 8 U.S.C. § 1154(a)(l)(A)(i). *Second*, the alien files a Form I-212 'Application for Permission to Reapply for Admission' to request permission to reapply for admission into the United States. *Third*, the alien files a Form I-601A 'Application for Provisional Unlawful Presence Waiver' to request the provisional waiver of inadmissibility. An alien is granted a provisional waiver only if *each of the forms* are approved.").

removal proceedings are administratively closed and have not been recalendared at the time of filing the application for a provisional unlawful presence waiver." 8 C.F.R. § 212.7(e)(4)(iii) (2018). For that reason, Garcia requested that the IJ in his removal proceedings adjourn his merits hearing to another date so that he could pursue the I-601A provisional waiver from DHS.

The IJ declined to order either a continuance or administrative closure in Garcia's case. The IJ denied Garcia's request for a continuance "because no good cause has been established for the requested continuance." J. App'x 28. The IJ also declined to grant Garcia administrative closure because, in light of *Matter of Castro-Tum*, administrative closure was "no longer an option in this case." *Id.* Garcia appealed to the BIA.

The BIA affirmed the IJ's denial of administrative closure because "[t]he Attorney General has explicitly held that the Board and the Immigration Judges lack the general authority to administratively close cases." *Id.* at 9 (citing *Matter of Castro-Tum*, 27 I. & N. Dec. at 278 n.3, 287 n.9). The BIA additionally stated that administrative closure was not necessary for Garcia to apply for a provisional unlawful presence waiver. The BIA observed that "[t]he DHS has amended the rules regarding provisional unlawful presence waivers to permit individuals with final removal orders to apply for provisional unlawful presence waivers in certain instances." *Id.* (citing Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 Fed. Reg. 50,244, 50,275-76 (July 29, 2016); 8 C.F.R. § 212.7(e)(4)(iv) (2018)). It noted that Garcia could request an administrative stay of removal from DHS instead.

Garcia petitioned for review of the BIA's decision.

## DISCUSSION

We review the denial of administrative closure for abuse of discretion. *Mi Young Lee v. Lynch*, 623 F. App'x 33, 34 (2d Cir. 2015); *see also Sanusi v. Gonzales*, 445 F.3d 193, 199 (2d Cir. 2006) (reviewing the denial of a motion for a continuance for abuse of discretion). The agency abuses its discretion when its decision "rests on an error of law … or a clearly erroneous factual finding or … cannot be located within the range of permissible decisions." *Morgan v. Gonzales*, 445 F.3d 549, 551-52 (2d Cir. 2006).

In this appeal, we consider (1) whether the agency's subsequent overruling of *Matter of Castro-Tum* renders its previous reliance on that decision an abuse of discretion; (2) if not, whether *Matter of Castro-Tum* represented a reasonable interpretation of the applicable regulations; and (3) whether the agency misapplied *Matter of Castro-Tum* in holding that it precluded Garcia from obtaining administrative closure. We address each question in turn.

## I

Since the BIA issued its decision in this case, the Attorney General has supplanted *Matter of Castro-Tum* with a new interpretation of the applicable regulations, set forth in *Matter of Cruz-Valdez*. 28 I. & N. Dec. at 329. The government argues, however, that the BIA "reasonably relied upon *Matter of Castro-Tum*—at a time when it was still good law—to deny Petitioner's administrative closure request." Letter at 2, *Garcia v. Garland*, No. 20-1641, ECF No. 76 (2d Cir. Sept. 17, 2021). In the government's view, "the agency does not abuse its discretion by relying on precedent that is controlling at the time it renders its decision," and for that reason "the BIA did not abuse its discretion by citing *Matter of Castro-Tum* as one ground for

denying Petitioner's request for administrative closure." *Id.* at 1-2. We agree.

An agency has not abused its discretion when it relied on an agency interpretation—such as the BIA's reliance on *Matter of Castro-Tum*—that was valid and applicable at the time the agency rendered its decision. Admittedly, that is not how the overturning of precedent works in the judicial system. "Because a judicial overruling is a reinterpretation of existing law, it typically takes effect immediately; the Court's new interpretation will apply to all pending disputes, including those arising out of events that pre-dated the new opinion."[6]

But agencies are not courts. When an agency interprets an ambiguous statute or regulation, it "may conduct what looks like an adjudicatory proceeding," but "in that proceeding the agency hardly interprets or applies a preexisting legal rule to the specifics of a case or controversy." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1173 (10th Cir. 2015) (Gorsuch, J.). Courts defer to the agency's interpretation not "because it represents a superior interpretation of existing law" but "because the agency has been authorized to fill gaps in statutory law with its own policy judgments." *Id.* That means the agency acts "less like a judicial actor interpreting existing law and a good deal more

---

[6] Deborah A. Widiss, *How Courts Do—and Don't—Respond to Statutory Overrides*, 104 Judicature 51, 53 (2020); *see Harper v. Va. Dep't of Tax.*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.").

like a legislative actor making new policy" that may differ at different times. *Id.*[7]

Under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984), and related cases, a court does not treat an agency's overruling of its own prior interpretation as if it were a judicial reinterpretation of existing law. Rather, when an agency reinterprets an ambiguous statutory provision, it is making policy within the bounds of discretion that Congress has conferred on the agency by statute. "[A] statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), and "the whole point of *Chevron*

---

[7] Even when an executive agency *acts* like a legislative or judicial actor, it still exercises executive power. *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) ("Agencies make rules … and conduct adjudications … and have done so since the beginning of the Republic. These activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they must be exercises of—the 'executive Power.'") (quoting U.S. Const. art. II, § 1, cl. 1); *see also* William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1577 (2020) ("Many … instances of non-Article III adjudication occur in true members of the executive branch—administrative agencies."). In *Humphrey's Executor v. United States*, the Supreme Court contemplated that an agency might "act[] in part quasi-legislatively and in part quasi-judicially" if it performs its "duties as a legislative or as a judicial aid." 295 U.S. 602, 628 (1935). Such an agency "cannot in any proper sense be characterized as an arm or an eye of the executive" because "[i]ts duties are performed without executive leave and … must be free from executive control." *Id.*; *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198 (2020) ("Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'"). The Supreme Court has said that *Humphrey's Executor*'s "conclusion that the FTC did not exercise executive power has not withstood the test of time." *Seila Law*, 140 S. Ct. at 2198 n.2. However that may be, we are here considering an executive agency.

is to leave the discretion provided by the ambiguities of a statute with the implementing agency," *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996). That is because filling statutory gaps "involves difficult policy choices that agencies are better equipped to make than courts." *Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

The policy choices of an agency need not remain static. As the Supreme Court explained in *Chevron*, "an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments." *Chevron*, 467 U.S. at 865. Thus, "[w]ithin the limits of the text," an agency's interpretation "might rest on a political judgment, which different administrations might legitimately make in different ways."[8] But the fact that agency interpretations vary between administrations based on policy considerations does not mean that the interpretation of either administration is invalid. *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) ("As long as the agency remains within

---

[8] Cass R. Sunstein, *Chevron as Law*, 107 Geo. L.J. 1613, 1626 (2019); *see also* Thomas W. Merrill, *The Chevron Doctrine: Its Rise and Fall, and the Future of the Administrative State* 150 (2022) (explaining that the "principle that favors administrative interpretation is the desirability of channeling issues of discretionary policy choice to administrative agencies" because the agency rather than a court is "the relatively more accountable and expert interpreter"); John F. Manning, *Lessons from a Nondelegation Canon*, 83 Notre Dame L. Rev. 1541, 1564 (2008) ("If an ambiguous organic act leaves open a question of policymaking discretion, it is preferable in our representative system to assume that Congress intended to delegate that discretion to more accountable agencies rather than to less accountable courts.") (footnote omitted).

the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.") (footnote omitted).

Judicial deference to an agency's interpretation of its own regulations implicates these same considerations. In *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), the Supreme Court reaffirmed its holding in *Auer v. Robbins*, 519 U.S. 452 (1997), that such deference is appropriate. The Court explained that "the core theory of *Auer* deference is that sometimes the law runs out, and policy-laden choice is what is left over." *Kisor*, 139 S. Ct. at 2415; *see also id.* at 2413 (plurality opinion) ("[T]he presumption that Congress intended *Auer* deference stems from the awareness that resolving genuine regulatory ambiguities often entails the exercise of judgment grounded in policy concerns.") (internal quotation marks and alteration omitted).

Because an agency interpretation of its regulations may reflect policy judgment, the interpretation may vary at different times—especially between different administrations—without casting doubt on the validity of the interpretation at either time. Indeed, in this case, whatever authority the BIA had to decide the issues before it was "[s]ubject to the[] governing standards" set out in 8 C.F.R. § 1003.1(d)(1)(ii) (2018), specifically including "decisions of the Attorney General," *id.* § 1003.1(d)(1)(i). The BIA did not abuse its discretion when it applied *Matter of Castro-Tum* while that decision was authoritative. A new Attorney General may have issued a new decision articulating a different interpretation of the applicable regulations, but that decision does not render the agency's previous compliance with the Attorney General's decisions an abuse of discretion. *See De Niz Robles*, 803 F.3d at 1173 (noting that a new

15

interpretation announced in an agency adjudication is subject to a "presumption of prospectivity").[9]

For these reasons, the decision of the BIA cannot be invalidated simply because it relied on a regulatory interpretation that the agency subsequently revised.[10] To the contrary, the agency permissibly relied on its previous interpretation of the regulations—provided, of course, that the interpretation itself was permissible. An agency interpretation of a regulation is permissible if it either follows from the unambiguous language of the regulation or, if "the regulation is genuinely ambiguous," the agency's interpretation of the regulation is "reasonable" in that it falls "within the zone of ambiguity" of the regulation. *Kisor*, 139 S. Ct. at 2415-16. We now turn to that question.

---

[9] The government might have declined to defend the BIA's decision in this case on the ground that it relied on *Matter of Castro-Tum*, but it has not done so. *See* Letter at 2, *Garcia v. Garland*, No. 20-1641, ECF No. 76 (2d Cir. Sept. 17, 2021) ("[T]he government is not waiving the argument that the Board reasonably relied upon *Matter of Castro-Tum*—at a time when it was still good law—to deny Petitioner's administrative closure request.").

[10] We emphasize that in *Matter of Cruz-Valdez* the agency reinterpreted its procedural regulations, effectively "announcing new rules of general applicability" and making a policy-laden judgment that, we have explained, resembles legislation and presumably applies prospectively. *Marquez v. Garland*, 13 F.4th 108, 112 (2d Cir. 2021) (quoting *De Niz Robles*, 803 F.3d at 1172). We recognize that when an agency adjudicator applies "preexisting rules" to "discrete cases and controversies," its decision may apply retroactively to past conduct, depending on certain factors. *Id.* at 111-12 (quoting *De Niz Robles*, 803 F.3d at 1172; *see also Lugo v. Holder*, 783 F.3d 119, 121 (2d Cir. 2015); Abner S. Greene, *Adjudicative Retroactivity in Administrative Law*, 1991 Sup. Ct. Rev. 261, 264 ("[A]djudicative retroactivity is generally justified on the ground that adjudicators deciding cases arising under antecedently given rules are applying those rules to particular cases.").

## II

The key question in this case is whether the agency abused its discretion by relying on *Matter of Castro-Tum*. *See Morgan*, 445 F.3d at 551-52. Such reliance would amount to an abuse of discretion if the regulatory interpretation reflected in *Matter of Castro-Tum* "rest[ed] on an error of law." *Id.* at 551. *Matter of Castro-Tum* would reflect a legal error if it either (1) interpreted unambiguous regulatory language incorrectly or (2) interpreted ambiguous regulatory language unreasonably. *See Kisor*, 139 S. Ct. at 2415 ("If uncertainty does not exist, there is no plausible reason for deference. … If genuine ambiguity remains, moreover, the agency's reading must still be reasonable.").

We conclude that the regulations considered in *Matter of Castro-Tum* are at least ambiguous and that the Attorney General's interpretation was reasonable. The BIA did not abuse its discretion by following that interpretation.

## A

We defer to an agency's reasonable interpretation of its own regulations only if those regulations are "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414; *see also Bey v. City of New York*, 999 F.3d 157, 166 (2d Cir. 2021) (declining to defer to an interpretation of unambiguous regulations). We have noted that the language in a statute or regulation is ambiguous if it is "reasonably susceptible" to two or more readings. *In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d

17

Cir. 2006).[11] We do not interpret the language in isolation. Rather, we look to "the language itself, the specific context in which that language is used, and the broader context of the statute" or the regulation "as a whole." *Union Carbide Corp. v. CIR*, 697 F.3d 104, 107 (2d Cir. 2012) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). We "must read the words in their context and with a view to their place in the overall statutory [or regulatory] scheme" because we construe statutes and regulations, "not isolated provisions." *Cuthill v. Blinken*, 990 F.3d 272, 279 (2d Cir. 2021).

We conclude that the regulations at issue here are at least ambiguous as to the permissibility of administrative closure. At the time of the BIA's decision affirming the IJ's denial of administrative closure, § 1003.1(d)(1) read, in relevant part, as follows:

> (i) The Board shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General (through review of a decision of the Board, by written order, or by determination and ruling pursuant to section 103 of the [Immigration and Nationality] Act).
>
> (ii) Subject to these governing standards, Board members shall exercise their independent judgment and discretion

---

[11] *But cf.* Raymond M. Kethledge, *Ambiguities and Agency Cases: Reflections After (Almost) Ten Years on the Bench*, 70 Vand. L. Rev. En Banc 315, 319 (2017) ("It matters very much … that judges work very hard to identify the best objective meaning of the text before giving up and declaring it ambiguous."); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2121 (2016) (noting that a "number of canons of statutory interpretation depend on an initial evaluation of whether the statutory text is clear or ambiguous" but "it is so difficult to make those clarity versus ambiguity determinations in a coherent, evenhanded way").

in considering and determining the cases coming before the Board, and a panel or Board member to whom a case is assigned may take any action consistent with their authorities under the Act and the regulations as is appropriate and necessary for the disposition of the case.

8 C.F.R. § 1003.1(d)(1) (2018). Section 1003.10 followed a similar structure at the time of the IJ's denial of administrative closure:

(b) Powers and duties. In conducting hearings under section 240 of the Act and such other proceedings the Attorney General may assign to them, immigration judges shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation. In deciding the individual cases before them, and subject to the applicable governing standards, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases.

...

(d) Governing standards. Immigration judges shall be governed by the provisions and limitations prescribed by the Act and this chapter, by the decisions of the Board, and by the Attorney General (through review of a decision of the Board, by written order, or by determination and ruling pursuant to section 103 of the Act).

*Id.* § 1003.10.

Some courts have concluded that the "any action" and "appropriate and necessary" language in § 1003.1(d)(1)(ii) and § 1003.10(b) provides an unambiguous and unalterable authorization

19

for administrative closure. *See Arcos Sanchez v. Attorney General*, 997 F.3d 113, 121-22 (3d Cir. 2021) ("[B]y considering the text, structure, history, and purpose of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii), we hold that the plain language establishes that general administrative closure authority is unambiguously authorized by these regulations."); *Meza Morales v. Barr*, 973 F.3d 656, 667 (7th Cir. 2020) ("*Castro-Tum*'s interpretive arguments fail to convince us that administrative closure is not plainly within an immigration judge's authority to take 'any action' that is 'appropriate and necessary for the disposition of … cases.'"); *Romero v. Barr*, 937 F.3d 282, 292 (4th Cir. 2019) ("Applying the standard tools of interpretation … we clearly discern from the text that the authority of IJs and the BIA to administratively close cases is conferred by the plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii)."). Those courts reasoned that administrative closure is an "action" as contemplated by the enabling regulations. *See, e.g.*, *Romero*, 937 F.3d at 292 ("[I]f we give the word 'any' its plain meaning, that language grants IJs and the BIA broad discretion in how to manage and resolve cases."). And the courts decided that the use of administrative closure in several cases proves that it is "appropriate and necessary" in many circumstances. *See, e.g.*, *id*. at 293-94.

We disagree. The regulations do not unambiguously permit administrative closure. The text of § 1003.1 and § 1003.10 could be understood to put "limiting parameters on what may be considered 'appropriate and necessary.'" *Arcos Sanchez*, 997 F.3d at 128 (Matey, J., dissenting). Both § 1003.1 and § 1003.10 limit the grant of authority to take "appropriate and necessary" measures to those measures undertaken "for the disposition of" cases. It is at least arguable that administrative closure does not constitute a disposition because it

does not resolve a case on the merits. *See Matter of Avetisyan*, 25 I. & N. Dec. at 695 ("[A]dministrative closure does not result in a final order."). Therefore, one might reasonably conclude that administrative closure is *not* necessary to dispose of cases. The canon against surplusage requires us to "give effect, if possible, to every clause and word of a statute," avoiding interpretations that would render one or more of the statute's provisions superfluous. *Panjiva, Inc. v. CBP*, 975 F.3d 171, 178 (2d Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). To avoid superfluity, the language "for the disposition of" must limit the category of actions considered "appropriate and necessary." 8 C.F.R. § 1003.1(d)(1)(ii) (2018); *id.* § 1003.10(b). The language therefore makes it ambiguous whether administrative closure is "appropriate and necessary" to dispose of cases.

Another court has reached a similar conclusion. The Sixth Circuit has explained that "[a]dministrative closure typically is not an action taken '[i]n deciding' a case before an IJ; instead, … it is typically a decision not to decide the case. Nor is administrative closure typically an action 'necessary for the disposition' of an immigration case. Administrative closure is not itself a 'disposition' of a case." *Hernandez-Serrano v. Barr*, 981 F.3d 459, 463 (6th Cir. 2020). Thus, "because the practice by design prevents the IJ from making any disposition in the case," the Sixth Circuit has held that "Section 1003.10 hardly provides general authority for such a practice." *Id.* This reading is not unambiguously foreclosed by the regulations.

**B**

Because the regulations are at least ambiguous, we consider the reasonableness of the Attorney General's interpretation in *Matter of*

21

*Castro-Tum*. We defer to a reasonable interpretation of ambiguous regulations as long as that interpretation reflects the agency's "fair and considered judgment" and its "authoritative or official position" on a matter that "implicate[s] its substantive expertise." *Kisor*, 139 S. Ct. at 2416-17 (internal quotation marks omitted). We do not defer to an interpretation that represents "a convenient litigating position or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (internal quotation marks, citations, and alteration omitted).

The interpretation reflected in *Matter of Castro-Tum* was articulated by the Attorney General, pursuant to his authority to "issue such instructions" and "review such administrative determinations in immigration proceedings" as he "determines to be necessary for carrying out" his oversight of the Executive Office for Immigration Review. 8 U.S.C. § 1103(g)(2); *see also* 8 C.F.R. § 1003.1(h)(1) (2018) (providing for the referral of BIA decisions to the Attorney General). Congress gave the Attorney General the authority to "speak with the force of law" in reviewing immigration decisions, and the interpretation here was issued pursuant to that authority. *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001); *see also Kisor*, 139 S. Ct. at 2412 (plurality opinion) (noting the presumption that "the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers") (quoting *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991)). The interpretation reflected "the agency's 'authoritative' or 'official position,'" *Kisor*, 139 S. Ct. at 2416 (quoting *Mead*, 533 U.S. at 257-59 & n.6 (Scalia, J., dissenting)), and its "considered judgment on the matter in question," *Christopher*, 567 U.S. at 155 (quoting *Auer*, 519 U.S. at

22

462), within the scope of "the agency's ordinary duties," *Kisor*, 139 S. Ct. at 2417 (internal quotation marks omitted).

We conclude that the Attorney General's interpretation of the regulations in *Matter of Castro-Tum* was reasonable. As noted above, the phrases "any action" and "appropriate and necessary," read in context, are respectively modified by "subject to the applicable governing standards" and "for the disposition of such cases." 8 C.F.R. § 1003.10(b) (2018); *see also id.* § 1003.1(d)(1)(ii). It is reasonable to read that language and conclude that it does not authorize administrative closure because such closure does not bring about the "disposition" of a case; it merely removes a case from an IJ's or the BIA's active calendar without resolution. *Hernandez-Serrano*, 981 F.3d at 463. Because other, enumerated authorities allow IJs and the BIA to suspend proceedings in immigration cases, administrative closure may not be "necessary" even if an adjudication required some suspension of proceedings. *See* 8 C.F.R. § 1003.29 (2018) (authorizing continuances); 8 C.F.R. § 1240.6 (2018) (authorizing adjournments); *see also Hernandez-Serrano*, 981 F.3d at 464 ("As early as 1958, regulations granted the predecessors to IJs … and the Board authority to take actions 'appropriate and necessary for the disposition of' their cases. Yet there is little if any record of immigration cases being administratively closed for nearly a quarter-century afterward.") (internal citations omitted).

The Attorney General reasonably interpreted the regulations as not authorizing administrative closure, and the BIA and the IJ permissibly relied on that interpretation in declining to grant Garcia

administrative closure.[12] When the Attorney General decided that the regulations did not authorize administrative closure, the BIA and the IJ were bound by that interpretation.[13]

## III

Garcia argues that even accepting that *Matter of Castro-Tum* bound the agency in this case, that decision allowed the IJ or the BIA to grant his request for administrative closure. Garcia points to the

---

[12] Indeed, the BIA and the IJ were required to follow that interpretation. Whatever authority the BIA or an IJ has to take actions that are "appropriate and necessary," that authority is "[s]ubject to these governing standards," 8 C.F.R. § 1003.1(d)(1)(ii) (2018), including "decisions of the Attorney General," *id.* § 1003.1(d)(1)(i); *see also id.* § 1003.10(b) (authorizing IJs to take actions "subject to the applicable governing standards"); *id.* § 1003.10(d) (providing that "[i]mmigration judges shall be governed by," among other things, decisions of the Attorney General).

[13] Garcia argues that the agency's reliance on *Matter of Castro-Tum* subjected him to "unfair surprise" because that decision was issued just over a month before his merits hearing. Petitioner's Br. 13. Yet even before *Castro-Tum*, whether to allow administrative closure was "a matter reserved to the discretion of the Immigration Judge or the Board." *Matter of Avetisyan*, 25 I. & N. Dec. at 695. The denial of administrative closure in this case did not represent an "upending of reliance" because Garcia could not have had a settled expectation of the agency granting him administrative closure. *Kisor*, 139 S. Ct. at 2418. In *Castro-Tum*, the Attorney General explained that the decision "does not raise due process or retroactivity concerns" because "[a]dministrative closure confers no legal entitlement to indefinite closure and has always been understood as revocable." 27 I. & N. Dec. at 294 n.14. This case does not resemble those in which regulated parties have been subjected to unfair surprise by the imposition of new liability or fines. *See Christopher*, 567 U.S. at 155-56 (identifying unfair surprise when the agency's interpretation of ambiguous regulations would "impose potentially massive liability ... for conduct that occurred well before that interpretation was announced").

DHS regulation governing eligibility for a provisional unlawful presence waiver. That regulation provides an exception to an alien's ineligibility for such a waiver if the alien's "removal proceedings are administratively closed and have not been recalendared at the time of filing the application for a provisional unlawful presence waiver." 8 C.F.R. § 212.7(e)(4)(iii) (2018). Garcia argues that because the DHS regulation expressly contemplates administrative closure in cases such as his, administrative closure remained an option for the IJ or the BIA in his case, despite the general rule of *Matter of Castro-Tum*.

But IJs and the BIA are delegates of the Attorney General, not the Secretary of Homeland Security. *See* 8 U.S.C. § 1101(b)(4) ("An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe.").[14] "Because only the Attorney General may expand the authority of immigration judges or the Board," a regulation promulgated by DHS "cannot be an independent source of authority for administrative closure." *Matter of Castro-Tum*, 27 I. & N. Dec. at 287 n.9.

## CONCLUSION

The agency did not abuse its discretion when it relied on the Attorney General's opinion in *Matter of Castro-Tum* to decline to grant Garcia administrative closure. We deny the petition for review.

---

[14] *See also* Exec. Office for Immigr. Rev., U.S. Dep't of Just., Immigration Court Practice Manual § 1.2(d) (2022) ("DHS is responsible for enforcing immigration laws and administering immigration and naturalization benefits. By contrast, the immigration courts and the Board of Immigration Appeals are responsible for independently adjudicating cases under the immigration laws. Thus, DHS is entirely separate from the Department of Justice and the Executive Office for Immigration Review.").